UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



HARVENS BRUNACHE,

        Plaintiff,

     v.                                 22-CV-196 (JLS)

ANTHONY J. ANNUCCI; Acting
Commissioner, N.Y.D.O.C.C.S.;
JOHN DOE, Commissioner of
Corrections, N.Y.D.O.C.C.S. (2018),
N.Y.S.D.O.C.C.S.;
JOHN DOE, Commissioner of
Correction (2017), Rikers Island,
N.Y.C.D.O.C.;
JOHN DOE, Superintendent Downstate
Correctional Facility;
SUPERINTENDENT BELL, Clinton
Main/Clinton Annex;
JOHN DOE, Superintendent Coxsackie
Correctional Facility; and
SUPERINTENDENT TITUS, Orleans
Correctional Facility,[1]

        Defendants.

## DECISION AND ORDER

*Pro se* Plaintiff, Havens Brunache, a prisoner confined at the Orleans

Correctional Facility, filed a complaint asserting claims under 42 U.S.C. § 1983.

Dkt. 1.  He specifically alleges that since his arrest in 2017 and subsequent

---

[1] The Court adds "John Doe" to the caption for each defendant not identified by
name.  The Clerk of Court is respectfully directed to amend the caption of this
action as set forth herein.

incarceration at Riker's Island ("Rikers") and several state correctional facilities—Downstate, Clinton, Coxsackie, and Orleans Correctional Facilities ("Downstate"), ("Clinton"), ("Coxsackie "), and ("Orleans")—his Eighth Amendment right to be free from cruel and unusual punishment was violated by Defendants' deliberate indifference to his serious medical needs.  Dkt. 1.  He also applied to proceed *in forma pauperis* and filed a signed authorization.  Dkt. 2.

Shortly after filing the complaint—and before this Court had an opportunity to screen it under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A—Brunache filed a motion to file a supplemental complaint.  Dkt. 3.  The Court granted Brunache permission to proceed *in forma pauperis* (Dkt. 2) and to file a supplemental complaint, limited to claims of mail interference or tampering and retaliation at Orleans, as set forth in his Motion.  Dkt. 4.  Brunache timely filed a supplemental complaint alleging mail interference and retaliation, and what appears to be additional claims of deliberate indifference under the Eighth Amendment.  Dkt. 5.

Shortly after Brunache filed his Supplemental Complaint, he filed an "Order to Show Cause" and Motion for a Temporary Restraining Order ("TRO") seeking an order directing Defendants to provide him with physical therapy services designed to restore and maintain "full function" of his leg and back, and further directing Defendant Anthony Annucci, Acting Commissioner, New York State Department of Corrections and Community Supervision ("DOCCS"), to arrange an examination with a neurologist to obtain a prescription for an appropriate course of physical

therapy, Dkt. 6.  He also subsequently filed another motion to file a supplemental complaint.  Dkt. 8.

      For the reasons that follow, (1) Brunache's claims against the Defendants in their official capacity are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B); (2) all claims asserted in the Complaint and Supplemental Complaint, except the Complaint's Eighth Amendment claim against Annucci, will be dismissed under §§ 1915(e)(2)(B) and 1915A, unless he files an amended complaint as directed below; (3) the motion for a TRO is denied; and (4) the motion to file a supplemental complaint is denied without prejudice.

## DISCUSSION

      Because Brunache has met the statutory requirements of 28 U.S.C. § 1915(a) and filed the required authorization, Dkt. 2, he was granted permission to proceed *in forma pauperis*.  Dkt. 4.  Therefore, under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), this Court must screen this Complaint.

## I.   REVIEW OF THE COMPLAINT

      Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).  The court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines that the action (1) fails to state a claim upon which relief may be

granted or (2) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)-(2).

Generally, the court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (internal quotation marks omitted); *see also Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) ("[A] *pro se* complaint generally should not be dismissed without granting the plaintiff leave to amend *at least once* . . . .") (emphasis added)). But leave to amend pleadings may be denied when any amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

At this juncture, the Court must accept all factual allegations as true and must draw all inferences in Brunache's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and a plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93, (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted)); *see also Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) ("[E]ven after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357

4

F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004).

## II.   BRUNACHE'S ALLEGATIONS

### A.   The Complaint[2]

Brunache has sued several supervisory officials at DOCCS and the New York City Department of Correction ("DOC"), including Annucci; John Doe, Commissioner of Corrections, DOCCS (2018); John Doe, DOC Commissioner, Rikers (2017);[3] and the Superintendents of Downstate (John Doe), Clinton Main/ Clinton Annex (Bell), Coxsackie (John Doe), and Orleans (Titus).  Dkt. 1, at 1-3.[4]  The

---

[2] The Complaint consists of a Form Complaint, several handwritten pages setting forth Brunache's allegations, and several exhibits.  Dkt. 1.

[3] The Court does not know who Brunache intends to sue when he names John Doe, "Commissioner of Corrections, N.Y.S.D.O.C.C.S (2018)," and John Doe, "Commissioner of Rikers Island, N.Y.C.D.O.C."  The Caption of the Complaint and the "Defendant's Information" Section of the Complaint are inconsistent as to these putative Defendants.  Dkt. 1, at 1-2.  Brunache's amended complaint must clarify who he intends to sue herein.  If he does not know the name of the individuals he intends to sue, he may name them as John Doe Defendants and, as he has, include their title, as well as the year or time-period during which their alleged conduct occurred, and any other information that could assist in identifying the individuals he intends to sue.

[4] Page references are to those generated by the Court's Case Management and Electronic Filing System.

complaint alleges deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[5][6]

Liberally construed, the Complaint alleges the following. Brunache was arrested in 2017 and, at some time either before or after his arrest, was a patient at Kings County Hospital suffering from chronic "nerves pain damages." *Id.* at 6. He was seen by a neurologist and prescribed the pain medication Gabapentin. *Id.* When he arrived at Rikers, he informed the medical staff of his "nerve's pain damages pains" and that he was prescribed Gabapentin. *Id.* He was then seen by a neurologist, given an MRI, and provided Gabapentin. *Id.*

On January 8, 2018, Brunache was transferred to DOCCS custody and received at Downstate. *Id.* He informed the medical staff of his medical history and was told that his medical records from Rikers had been forwarded to DOCCS. *Id.* He was provided only with the remaining Gabapentin that came with him from Rikers and was told that when the pills were gone, he could not receive more because "N.Y.D.O.C.C.S. Commissioner of Corrections and Commissioner of the N.Y.D.O.C.C.S."[7] implemented a policy, "HSPM 1.24-Medications with Abuse Potential," "greatly reducing" the use of certain medication with abuse potential,

---

[5] The only reference to a specific medical condition the Court could locate in the Complaint and Exhibits refers to the condition as sciatica. Dkt. 1, at 23 (Grievance Response).

[6] The Court deems the exhibits attached to Plaintiff's Complaint part of the pleading and considers them in its screening decision. *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered".)

[7] *See supra* at n.3.

including Gabapentin, unless deemed medically necessary.  *Id.* at 6-7, 18
(Grievance), 21 (Grievance Response).  He abruptly was told to return to his cell and
was left "untreated maliciously."  *Id.* at 6.  Brunache immediately filed a Grievance
on March 4, 2018, requesting that he be provided access to his medical records from
Rikers "so that Rikers would not be [to] blame for the medical records not even
being considered" by DOCCS's medical staff.  *Id.* at 7, 18, 21.

On March 5, 2018, he was "quickly transferred" to Clinton Main (Max) and
was still denied access to his medical records.  *Id.* at 7.  He had been in "so much
pain and suffering" for over 60 days without Gabapentin.  *Id.*  On March 23, the
Grievance Hearing was held, and he was given notice that he could review his
medical records.  *Id.*  DOCCS and Clinton had knowledge of his records from Rikers
but "Rikers, [DOC], never informed . . . DOCCS Medical Staff (Health Care
Services) of [his] street records faxed [sic] and obtained by then to be part of [his]
records medically always thereafter resulting in [his] being immediately seen and
sent [for an] M.R.I. . . . upon his arrival [Rikers] reception . . . ."[8]  *Id.*  This, however,
"did not and would not have mattered much thereafter because" Defendant
Superintendent Bell denied his Grievance or Appeal based on HSPM 1.24, stating
that "[t]he continued use of [Gabapentin] has not been deemed medically necessary
or in compliance with this policy."  *Id.* at 7, 21.  Brunache was not, however,
provided an alternative pain medication, and he wrote to DOCCS Deputy
Commissioner Dr. Koenigsmann while awaiting a response to his Grievance Appeal.

---

[8] This language is quoted because it is confusing.

7

*Id.* at 8.  The Regional Health Services Administrator (Baldwin) responded on behalf of Dr. Koenigsmann on May 25, 2018—Baldwin informed Brunache that the Division of Health Services had investigated his concerns, that his complaints were being addressed in his pending Grievance, and that he should continue to bring his medical concerns to the attention of the health care staff through the facility's sick call procedure.  *Id.* at 8, 22 (Response to Dr. Koenigsmann Letter).  Brunache suffered "in pain" the entire next year without being provided any pain medication other then over-the-counter ("OTC") medication, which provided no relief.  All of this occurred because of DOCCS policy, HSPM 1.24.  *Id.* at 8.

On or about June 4, 2019, after Superintendent Bell denied his first Grievance, *id.* at 7, 21, Brunache filed another grievance requesting an immediate neurological examination.  *Id.* at 8, 23 (Grievance Decision).[9]  The Grievance allegedly was denied by Superintendent Bell.  *Id.*  The denial stated:

> The grievant alleges that he has been denied to see [sic] a Neurologist.
>
> An investigation with medical staff has revealed that, when the grievant first came into DOCCS he was on Neurontin for sciatica and

---

[9] The Grievance Form is under the "letterhead:" "Inmate Grievance Program, E. Bell, Superintendent." Dkt. 1, at 23.  It is not clear whether this was the initial denial of the Grievance by the Inmate Grievance Review Committee ("IGRC") or denial of the appeal from the initial denial of the Grievance.  *See* N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5.  In New York, prison inmates must follow a three-tiered grievance procedure. An inmate must first file the grievance with an inmate grievance program supervisor, who forwards the grievance to the Inmate Grievance Resolution Committee for initial decision.  *Id.*  If the inmate is unsatisfied with the IGRC's decision, he has seven days from its receipt to appeal the decision to the superintendent by returning the appeal section of the IGRC response form to the grievance clerk.  If dissatisfied with the superintendent's decision, the inmate then has another seven days from the receipt of the superintendent's decision to appeal to the Central Office Review Committee ("CORC").  *See id.*

he requested to be taken off of it on 1/19/18. The medication was
discontinued by his provider on 1/23/18.

The grievant drafted into Clinton Main on 2/9/18 and there was no
request at that time for a Neuro consult. The grievant transferred to
the Clinton annex in January 2019 and has been seen in the clinic
multiple times since then for various complaints;  he has mentioned
neck pain, both right and left side and has also mentioned that the
pain has relieved on its own or with the help of OTC medications.  On
9/25/19 he had an EMG and on 2/5/19 he had x-rays of both hips and
his lumbar/sacral spine. The results of these have been received and
reviewed by the provider. There is no urgency for the grievant to be
seen. An appointment had been scheduled to review the results with
his provider.

Upon conclusion of the investigation, the grievant has been provided
with adequate care and there is no evidence of staff malfeasance.

*Id.* at 23.  Brunache (or someone) hand wrote on the Grievance Denial that he was

"[f]inally given (Naproxen) after review of just x-rays."  *Id.*

Brunache eventually received a response from DOCCS's Central Office

Review Committee ("CORC"), which granted his grievance in part and directed that

he be revaluated by the Clinton Annex Health Services Department.  *Id.* at 9.  He

immediately forwarded a notarized letter to the Health Care Administrator's

("HCA") Office, with a copy of his Grievance and CORC's Response.  *Id.* at 9, 26-27

(Letter).  Brunache was seen by the HCA Office and told that based on his February

5, 2019, x-rays, he could receive a substitute pain medication.  *Id.* at 9.  He was

prescribed Naproxen, 500 mg.  *Id.*  He still, however, was not seen by a neurologist,

and all requests to see one were denied.  *Id.* at 10.  He, therefore, again raised to

DOCCS Central Office his request to be seen by a neurologist for his continued

pain.  *Id.*

On July 20, 2020, Brunache was "properly" taken off Naproxen because of potential side-effects.  *Id.* at 11.  He alleges that he needed to be assessed by a neurologist so he could again receive Gabapentin "now more than ever."  *Id.*  He was then transferred to Coxsackie and gradually began losing his ability to stand without bracing himself and experiencing shooting pain down his legs, hips, and back.  *Id.*  Brunache continued to complain and suffer from pain until he fell and was unable to move.  *Id.*  He was transported to a hospital, where he was given "pain shots (Hydroclorizen?)" and OTC medication.  *Id.*  He continued to fall and had to hold onto walls to stand.  *Id.*  On August 26, 2021, Brunache was transferred to Orleans.  *Id.*  On or about October 21, 2021, he wrote to the New York State Commission of Correction and was advised that his letter was forwarded to DOCCS's Office of Special Investigation.  *Id.* at 11, 30 (Response to Letter).  On November 10, the Commission of Correction referred Brunache to Dr. John Morley, DOCCS Acting Deputy Commissioner, Chief Medical Officer.  *Id.* at 11, 31 (Second Response to Letter).  On November 14, 2021, he was "finally" provided Gabapentin. *Id.* at 12, 31.

On November 30, 2021, after receiving notice from Dr. Morley's Office that an MRI had been scheduled, Brunache forwarded a Notice of Intent to File a Lawsuit to the New York State Attorney General's Office.  *Id.* at 12.  On February 18, 2022, he was taken to the Wyoming General Hospital and had an MRI, following which he was referred to an orthopedic specialist.  *Id.*

**B.     The Supplemental Complaint**

Liberally construed, the Supplemental Complaint (Dkt. 5) alleges the following.  On or about February 28, 2022, Brunache submitted his Complaint in this case to Orleans for mailing to the Court, but it was not mailed until March 8.  Dkt. 5, at 8, 19 (DOCCS Authorized Advance Request for Postage); *id.* at 21-22 (Grievance).[10]  He asserts that while the mail package containing his Complaint was in the hands of Orleans for mailing, it was opened outside of his presence and returned to him "unsealed" because the "certification sticker" was not properly placed on the envelope.  *Id.* at 8.  This was done purposely to "compromise[]" and hold up his lawsuit from March 4-8.  *Id.*  His complaint was read outside of his presence by Orleans officials.  *Id.*

On March 10, 2022, he was taken to ECMC for his orthopedic examination that was recommended after his MRI at Wyoming on January 18, 2022.  *Id.*  At the exam, Brunache asked where his MRI results were, and he was questioned by the orthopedic surgeon why the MRI results were not sent with him.  *Id.*  She told him that Wyoming did not send the MRI and report electronically nor did she receive them from DOCCS.  *Id.*  Brunache asserts the MRI results purposely were not forwarded to ECMC so that the consultation would not take place and his treatment would be compromised further.  *Id.* at 5-8.  The orthopedic surgeon acted like she knew nothing about the examination and blamed him for the lack of records.  *Id.* at

---

[10] This portion of the Supplemental Complaint is not entirely clear regarding when the Complaint was finally mailed to the Court and the cause of the delay.  Dkt. 5, at 8.  The Complaint was received by the Court on March 10, 2022.  *See* Dkt. 1, at 1.

7. He was told he could undergo an x-ray but was denied an examination. *Id.* at 7-8. Brunache claims that Annucci acted in concert with Wyoming and ECMC to deny him an examination when Orleans and Wyoming did not send the MRI results to ECMC. *Id.* at 5-8.

When Brunache returned to Orleans, a nurse read the return paperwork and told him it indicated that he refused his appointment at ECMC, and that he was violent and abusive. *Id.* at 8. The nurse informed the Area Sergeant of what transpired at ECMC and told him that Brunache was behaving the same way towards her. *Id.* The Area Sergeant took statements and opened an investigation. *Id.*

Brunache claims that he then realized that his lawsuit and "everything" was being compromised and he became fearful for his life. *Id.* at 8-9. He then filed a Grievance requesting copies of the Grievance, the Court's consent to a Magistrate Judge Form that he mailed to the Court and its affidavit of service, and the Notice of Intent to File a Supplemental Complaint he mailed to Annucci. *Id.* at 9, 28 (Request for Copies). He received the copies five days later and placed them in the United States Mailbox on his housing unit (C-1-46)—presumably along with his Motion to File a Supplemental Complaint.[11] *Id.* at 9. He filed a Grievance on March 15 related to the five-day delay in receiving the requested copies and was called to the Sergeant's Office. *Id.* at 9, 31-32 (Grievance). He was advised of the

---

[11] This motion was received by the Court on March 21, 2022. Dkt. 3, at 1.

investigation into the March 10 incident and, when he responded that he filed the documents out of concern for his safety, he was made to sign a form stating he did not consent to his placement in voluntary protective custody. *Id.* at 9. When he returned to his cell (cube), he discovered that it had been searched, his locked locker door opened, and copies of his grievance taken. *Id.* He claims this was retaliatory for filing grievances and forwarding documents to the Court. *Id.* Brunache then wrote to his new corrections counselor requesting immediate placement in medical protective custody because of his "untreated compromised all conditions and fears for [his] life, safety, and liberties . . . ." *Id.*

On March 22, 2022, Brunache was called down to sign off on his March 5 and 15, 2022 Grievances and was told that these Grievances, and the copy of the March 15 Grievance mailed on March 16, were never received by the IGRC. *Id.* at 10. He immediately was permitted to refile the Grievance regarding the March 10 incident "and all of its related events," and "remember as same as First Grievance [sic] now said to be gone as well and never received by [the] IGRC." *Id.* He claims that all his matters have been compromised, that his attempts to exhaust his legal remedies have been interfered with, and that this has caused him physical harm and harm "to [his] legal matters." *Id.* at 10, 33-36 (Grievance Office Complaints).

Then, "finally out of nowhere" DOCCS's Office of Special Investigations, which was investigating his complaints related to the denial of medical care, sent him a notice that they had "all [his] notices re[c]ently sent and my monitored phone call[]s, as well pertaining to all my attempts at seeking help and exhausting all my

legal remedies." *Id.* at 10, 56 (Correspondence to Drs. Morley and Ash that OSI had sent him a notice on March 31, 2022).  Brunache also received a letter, dated March 25, 2022, from Ash, Regional Health Service Administrator on behalf of Dr. Carol Moores, Acting Deputy Commissioner, Chief Medical Officer—the letter addressed his March 10, 2022, orthopedic consultation at ECMC and stated that his concerns had been investigated and they were being addressed through the grievance process at Orleans. *Id.* at 37 (Letter).  On March 30, 2022, a memorandum from Orleans Nurse Grimes indicated that Brunache's orthopedic consultation would be rescheduled and that the MRI report and disc should be sent to ECMC for the appointment. *Id.* at 49 (Memorandum), and 78 (Superintendent Response to Grievance).  On that same date, Dr. Moores sent a letter on behalf of Annucci that addressed Brunache's complaints regarding his treatment at Orleans and stated that she had been informed that Brunache had refused the orthopedic evaluation at ECMC and that he had "a history of care refusals." *Id.* at 53 (Letter). [13]

## III.   ANALYSIS

### A.   Venue

Before the Court examines Brunache's claims under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, it must address whether he properly filed this action in this district, *see* 28 U.S.C. § 1391(b)(1)-(3) (where venue properly laid), and whether certain claims can and should be severed and transferred, *see* 28 U.S.C. § 1404(a) (where venue proper but district court has discretion to transfer based on

---

[13] This section of the Supplemental Complaint also is confusing.

convenience of witnesses and parties) and 1406(a) (where venue is improper as to claims against some defendants, a district court has the discretion to dismiss those claims or transfer them to the appropriate district in the interest of justice); Fed. R. Civ. P. 21 (severance of claims).  The general venue statute provides that "a civil action may be brought in—

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

Here, Defendants are all, allegedly, New York residents.  *See, e.g., Salgado, Jr. v. NY Dep't of Corr. and Cmty. Supervision*, 13-CV-01108-RJA-MJR, 2018 WL 1663255, at *4 (W.D.N.Y. Apr. 6, 2018) (noting that for venue purposes, "public officials reside in the district in which they perform their official duties").  One or more defendants reside in one of each of the four districts in New York.  *See* 28 U.S.C. § 112.[14]  Venue therefore is proper in this district under 28 U.S.C. §

---

[14] Annucci; John Doe, Commissioner of Corrections, DOCCS (2018); Superintendent Bell, Clinton Main/ Clinton Annex; and John Doe, Superintendent Coxsackie, likely reside in the Northern District; John Doe, Rikers Commissioner, D.O.C. (2017) likely resides in the Eastern or Southern Districts, *see, e.g., Hamlett v. Widtzer*, No. CV 2011–3106(CBA)(MDG), 2013 WL1338859, at *2 n.2 (E.D.N.Y. Mar. 8, 2003) (discussing whether Riker's falls within the concurrent jurisdiction of the Eastern and Southern District and how each district interprets the language of 28 U.S.C. § 112, differently when determining which district Riker's lies within) (comparing cases); John Doe, Superintendent Downstate likely resides in the Southern District;

1391(b)(1)—the judicial district where any defendant resides, if all are located within the same state.  It cannot be said, however, that a substantial part of the events or omissions underlying Brunache's medical care claims occurred in this or any other of the three districts.  *See id.*, § 1391(b)(2).

This Court has discretion to sever the claims that arose in each of the different districts, *see* Fed. R. Civ. P. 21, and transfer them separately to those districts, assuming they could have originally been brought in those districts.  *See* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.").  In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Morris v. Northrop Grumman Corp.,* 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999).

Further,

> A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants.

---

and Titus, Superintendent Orleans, likely resides in the Western District.  *See* Dkt. 1, at 1-3; 28 U.S.C. § 112.

*Cain v. N.Y. Bd. of Elections,* 630 F. Supp. 221, 225-226 (E.D.N.Y. 1986) (citations omitted).

When deciding whether to transfer an action *sua sponte*, district courts follow the same analysis used when a party itself moves for a transfer of venue. *See, e.g., Flaherty v. All Hampton Limousine, Inc.,* No. 01 Civ. 9939 SAS, 2002 WL 1891212, at *1-2 (S.D.N.Y. Aug. 16, 2002); *Haskel v. FPR Registry, Inc.*, 862 F. Supp. 909, 916 (E.D.N.Y. 1994). Specifically, "[m]otions to transfer venue are governed by a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." *Flaherty*, 2002 WL 1891212, at *1 (citations and internal quotations omitted).

At this preliminary juncture, however, the Courts finds that severance and transfer is not appropriate and would not be in the interest of justice. Brunache's claims against each of the Defendants "share a common nexus of law and fact"—an Eighth Amendment violation based on denial of medical care—and the claims center mainly around the allegations that Annucci and the Superintendents of the facilities in which he was incarcerated improperly implemented and followed DOCCS policy, HSPM-124, to deny him Gabapentin or an alternative pain medication. *See Lewis v. Zon*, 614 F. Supp. 2d 362, 364 (W.D.N.Y. 2009) (denying defendants' motion to sever and transfer like claims against defendant correctional officials who resided in three different districts in New York); *cf. Santos v. Wood*, 9:20-CV-0421 (LEK/DJS), 2020 WL 3211136, at *6 (N.D.N.Y. June 15, 2020)

17

(granting motion to sever and transfer claims where the claims arising at facilities located in the Western District were "separate and distinct" from the claims arising at facilities located in Northern District). As Judge Larimer stated in *Lewis* in like circumstances,

> The relevant evidence will likely consist primarily of documentary evidence, expert witness reports, and other items readily subject to copying and electronic transfer. Furthermore, this matter [at this time] presents no issues of state law, compulsory process for non-party witnesses or judgment enforceability which might bear upon the Court's analysis. In sum, trial of the plaintiff's claims in a single forum, rather than the three different fora proposed by the movants, will promote judicial economy and vitiate the need to engage in duplicative discovery and re-litigate many of plaintiff's claims.

614 F. Supp. 2d at 364.

The Court recognizes that any trial "will presumably require [some] defendants to travel to this district from elsewhere in the state"—but at this time, the Court cannot make a finding of "prejudice or inconvenience," or "that parallel litigations in the [Eastern], Northern, Southern and Western Districts of New York would be more convenient and would better serve the interests of justice than a single trial of the matter here." *Id.* (internal quotation marks omitted and citing *Ahern v. Northern Tech. Int'l Corp.,* 206 F. Supp. 2d 418, 421 (W.D.N.Y. 2002)). Further, the claims raised in the Supplemental Complaint allegedly occurred in this District.

The Court emphasizes that this is a preliminary finding for purposes of screening only and is subject to change either *sua sponte* or upon motion of the parties as the litigation progresses beyond screening. If Brunache chooses to file an

18

amended complaint as directed below, he is instructed to consider the proper venue of the claims asserted therein and whether severance and transfer would then be appropriate and in the interest of justice.  At that time, the Court again will review the appropriateness of severance and transfer.

### B.    Eleventh Amendment

Both the Complaint and Supplemental Complaint indicate that Brunache is suing Defendants only in their official capacities.[15]  He seeks only monetary damages in both complaints.[16]

The Eleventh Amendment bars federal court claims against states, absent their consent to such suit or an express statutory waiver of immunity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984).  The Eleventh Amendment bar extends to agencies and officials sued in their official capacities.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Gollump v. Spitzer*, 568 F.3d 355, 365 (2009) (the Eleventh Amendment generally bars suits in federal courts against state officials sued in their official capacity).  Because Plaintiff cannot obtain damages against the

---

[15] The Form Complaint contains a question asking whether a defendant is sued in his individual or official capacity or both, and the plaintiff needs to check either one or both choices.  Dkt. 1, at 2-3; Dkt. 5, at 2.  Brunache checked only official capacity.

[16] The Court notes that Brunache filed a motion for a TRO seeking some form of injunctive relief, Dkt. 6, but because the motion is denied, *see supra* at 43-44, the Court does not construe either Complaint as seeking prospective injunctive relief.  *See Ex parte Young*, 209 U.S. 123 (1908) (carving out a narrow exception to Eleventh Amendment bar against suit against state where plaintiff sues state officials, in their official capacities, so long as the plaintiff seeks only prospective declaratory or injunctive relief to remedy an ongoing violation of federal law.)

19

Defendants in their official capacities, the Court construes the Complaint and Supplemental Complaint in Brunache's favor to be brought against the Defendants in their individual capacities. *See, e.g., Henderson v. Hannah*, Case No. 3:20-cv-559 (SRU), 2020 WL 4432913, at *1 n.3 (D. Conn. July 31, 2020) ("[The Court] construe[s] the complaint most broadly to allege claims against the Defendants in both their official and individual capacities because [the plaintiff] has requested both monetary and injunctive relief.  A plaintiff may seek injunctive relief under Section 1983 only by suing a state official in his or her official capacity.  [The plaintiff] may not seek money damages against . . . defendant[s] in their official capacities because those claims are barred by the Eleventh Amendment.") (citation omitted).

## C.   The Complaint

Brunache asserts that DOCCS and the several facilities at which he has been incarcerated knew since his arrival at Downstate from Rikers, on or about January 18, 2018, that he suffered from "chronic[] damages and sufferings" and that HSMP 1.24 should not have been used to deny him Gabapentin or an alternative pain medication for almost four years.  Dkt. 1, at 10, 12.  He also alleges that when he was detained at Rikers in 2017, DOC Commissioner (2017), *see supra* at n.3, withheld his medical history and records from DOCCS to deny him proper medical treatment.  *Id.* at 7, 14 (Third Claim).  He alleges that Defendants violated his rights under the Eighth Amendment based on the denial of pain medication and

necessary physical examinations to confirm his orthopedic or neurological condition. *Id.* at 13-15 (First through Seventh Claims).

The Eighth Amendment forbids "deliberate indifference to serious medical needs of prisoners." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (quotation marks omitted). A prisoner's claim of deliberate indifference to his medical needs by prison officials charged with his care is analyzed under the Eighth Amendment because it is an allegation that "conditions of confinement [are] a form of punishment" and, thus, is a "violation of [the] Eighth Amendment right to be free from cruel and unusual punishments." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). To state a deliberate indifference claim, an inmate must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the defendants "acted with deliberate indifference." *See, e.g.*, *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

The first element is "objective" and requires the plaintiff show that the "alleged deprivation of adequate medical care [is] sufficiently serious." *Spavone*, 719 F.3d at 138 (citations and internal quotation marks omitted). In other words, the plaintiff "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted). The objective element involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," and "whether the inadequacy in medical care is sufficiently serious"—which in turn

"requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).   Nevertheless, the Second Circuit has articulated the following non-exhaustive list of factors when evaluating a prisoner's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and internal quotation marks omitted).

The subjective element requires the plaintiff show that prison officials were "subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted).   The prison official must have "appreciate[d] the risk to which a prisoner was subjected," and have had a "subjective awareness of the harmfulness associated with those conditions[.]" *Darnell*, 849 F.3d at 35; *see also Nielsen v. Dabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness . . . require[ing] that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and internal quotation marks omitted)).   In a case involving medical treatment not arising from an emergency situation, "the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it

suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280 (citation omitted). An official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (quoting *Farmer*, 511 U.S. at 835). Importantly, neither does "mere disagreement over the proper treatment . . . create a constitutional claim"; "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

For purposes of screening only, the Court concludes that the Complaint sets forth facts, assumed as true, plausibly alleging a sufficiently serious medical need. Brunache alleges that since his transfer to DOCCS custody in 2018, he suffered from orthopedic or neurological conditions, *albeit* unspecified in the Complaint but noted in a grievance as sciatica, that caused him significant and constant pain for several years. *See Faraday v. Lantz,* No. 03–CV–1520, 2005 WL 3465846, at *5 (D. Conn. Dec. 12, 2005) (persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica . . ." leading to severe pain constitute a serious medical need); *Mendoza v. McGinnis,* No. 05 Civ. 1124, 2008 WL 4239760, at *10 (N.D.N.Y. Sept. 11, 2008) ("In this instance, given plaintiff's diagnosed condition of degenerative disc disease . . . [the Court] conclude[s] that a reasonable

fact finder could find that the condition constitutes a serious medical need"). Here, Brunache had undergone an MRI at Rikers and thereafter was prescribed Gabapentin. Dkt. 1, at 6. His pain went untreated after his remaining Gabapentin was used at Downstate, and he was denied any further medication, except OTC medication, until 2019 when, after x-rays of his hips and lumbar/sacral spine were taken, he was provided Naproxen, which had to be discontinued. After he wrote to the Commission of Correction he was transferred to Orleans and finally prescribed Gabapentin in November 2021.

The subjective element—whether Brunache plausibly alleges deliberate indifference to his pain and medical conditions and, if so, whether Defendants were personally involved in the alleged denial of care—raises more difficult issues. Brunache alleges that he was denied Gabapentin or an alternative and adequate pain medication at each of the DOCCS facilities because of a written DOCCS policy, HSPM 1.24, that restricted the use of prescription narcotic pain medication despite his constant complaints of pain and notice to prison officials that OTC medication was not effective to treat his pain.

It is well-established that "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *see, e.g., Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir. 2011) (finding that plaintiff's complaint failed to state a deliberate medical indifference claim where it alleged that

defendants prescribed plaintiff Motrin instead of a stronger pain medication and declined to order a nerve conduction study as requested by the plaintiff); *Jacks v. Annucci*, No. 18-CV-3291 (KMK), 2019 WL 3239256, at *4 (S.D.N.Y. July 18, 2019) (allegations that alternative medication to plaintiff's preferred pain medication (Lyrica) was inadequate did not state a constitutional claim of deliberate indifference) (collecting cases).

Similarly, courts in this Circuit have held that allegations that prison officials failed to prescribe narcotic pain medication pursuant to an alleged policy restricting the prescription of narcotic pain medication did not state a claim under the Eighth Amendment—rather than plausibly allege deliberate indifference, the plaintiffs alleged a difference of opinion about treatment. *See, e.g.*, *Santos*, 2020 WL 3211136, at *8-9 ("[D]ifferences in opinions between a doctor and an inmate as to the appropriate pain medication do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs.")); *Williams v. Adams*, No. 18-CV-1041 (BKS/TWD), 2019 WL 350215, at *5 (N.D.N.Y. Jan. 29, 2019) (dismissing a deliberate indifference claim based upon an assertion that defendant-doctor failed to prescribe morphine-based pain medication because the allegations amounted only to a "mere disagreement with the course of treatment administered by [defendant]"). In these cases, the dismissal of the claims against the defendant-doctors was based not on a failure to prescribe pain medication due to a policy of the prison or DOCCS—but, rather, due to the plaintiff's failure to allege

that defendant-doctors were deliberately indifferent based on their failure to

prescribe the pain medication plaintiffs desired.

In *Williams*, the Court outlined the numerous steps the defendant-doctor

("Adams") took to treat plaintiff's conditions and symptoms between November 2016

and September 2017, and then stated:

> Presumably defendant Adams'[s] ability to prescribe morphine pain
> medications was hampered by the prison and/or DOCCS policy (to which
> the complaint refers) regarding a restriction against prescribing
> inmates narcotic pain medications.  Even assuming these allegations
> are true, however, defendant Adams'[s] consistent treatment of
> plaintiff—through diagnostic examinations, prescription of non-narcotic
> pain medications, physical therapy, and consultations with other
> medical providers—reflects constitutionally adequate care in the
> context of a prison facility.  Moreover, there are no allegations in the
> complaint that the failure to prescribe plaintiff's preferred choice of pain
> medication was in reckless disregard to plaintiff's health and safety,
> especially in light of the other treatment defendant Adams provided
> between November 2016 and September 2017.

2019 WL 350215, at *5.  In *Santos*, the dismissal was based not on the alleged

policy against prescribing pain medication, but rather was based on the plaintiff's

failure to adequately allege deliberate indifference because plaintiff alleged only a

difference of opinion about his treatment.  2020 WL 3211136, at *10 ("With respect

to Plaintiff's allegations related to the . . . Defendants' failure to adequately treat

[Plaintiff], differences in opinions between a doctor and an inmate as to the

adequate pain medication do not support a claim that the doctor was deliberately

indifferent to the inmate's serious medical needs.").  *Id.*

Recognizing this is a close issue, the Court finds that Brunache's allegations

assert more than simply a "mere disagreement" regarding the type of pain

medication he wished to receive during his incarceration between 2018 and 2021.

His allegations, assumed as true, allege that he entered DOCCS custody in 2018 and was told after his prescribed medication (Gabapentin) was used, he would not be provided that medication or any alternative narcotic pain medication, but would receive OTC medication only. He further alleges that OTC medication was not effective to relieve his pain and that he specifically was denied pain medication pursuant to HSPM 1.24. Dkt. 1, at 21. At this stage of the litigation, these allegations at least raise a reasonable inference that he was denied *all* adequate prescription pain medication—not just his previously prescribed medication, Gabapentin—and that he was denied orthopedic or neurological examinations to assess his pain.

This does not end the subjective element analysis—the Complaint must also allege that each Defendant personally knew of and disregarded an excessive risk to Brunache's health or safety by denying him adequate pain medication and medical examinations. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); *see also Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (Section 1983 claim must allege the personal involvement of an individual defendant in the purported constitutional deprivation). Because the Complaint is wide-ranging and does not address each Defendant equally, the Court will consider the Defendants separately.

1. <u>Acting Commissioner Annucci</u>

Brunache alleges that Annucci instituted a written policy, HSPM 1.24, restricting the use of narcotic pain medication and that it specifically was used to deny him Gabapentin or any adequate, alternative pain medication except OTC

medication at each DOCCS facility between 2018 and 2021.  Dkt. 1, at 6-7.  He also alleges that he wrote letters of complaints to Annucci and others in DOCCS's Central Offices and filed numerous grievances complaining about the denial of pain medication and need to see a neurologist or other medical specialist.  *See, e.g.*, Dkt. 1, at 10.

"A supervisory official, such as Annucci, may not be held liable merely because he 'held a high position of authority.'"  *Santos*, 2020 WL 3211136, at *9 (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)).  Rather, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Tangreti*, 983 F.3d at 618 (internal quotation marks omitted).[17]

---

[17] Until the United States Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. at 676, which reiterated that a government official "is only liable for his or her own misconduct," the Second Circuit's test for determining personal involvement for supervisory officials was governed by the five factors set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995): "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."  Following *Iqbal*, the survival of *Colon's* five-factor test was "unclear" and "divided courts in the Second Circuit" for more than a decade and remained unclear until the Second Circuit's decision in *Tangreti*.  *See, e.g.*, *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *6-8 (S.D.N.Y. Sept. 28, 2021) (summarizing the "legal landscape" in the Second Circuit regarding supervisory liability under Section 1983, including the post-*Iqbal* divisions in the Circuit regarding the viability of *Colon's* five-factor test, and how the Second Circuit "clarif[ied] the effect of *Iqbal* on its *Colon* precedent").  "District courts applying *Tangreti* . . . since it was decided have

While *Tangreti* overruled *Colon's* five-factor test, including factor (3)—"the defendant created a policy or custom under which unconstitutional practices occurred," *Colon*, 58 F. 3d at 873— it did not "suggest" that a defendant who "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," cannot be found liable under Section 1983.  *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at **6-8 (S.D.N.Y. Sept. 28, 2021). As the *Stone* court observed:

> An individual who creates a policy or custom whereby the constitution is violated, however, is more directly and personally involved in the constitutional violation than someone who is only negligent in his supervision of the official committing the underlying offense.  Holding a policymaker liable for his or her personal handiwork—the creation or maintenance of a policy or custom—is not the same as holding a supervisor vicariously liable for the actions of his subordinates. . . . [W]here a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state—in this case, deliberate indifference—the Court is of the view that such official could be deemed to be personally involved in a constitutional violation. . . [T]he principle that policymakers can still be liable under Section 1983 after *Iqbal* is consistent with the case law, including post-*Tangreti* district court decisions and the decisions of other Courts of Appeals.

*Id.* at **8-9 (internal citations omitted)*; cf. Lindsey v. Butler*, 43 F. Supp. 3d 317, 330 (S.D.N.Y. 2014), reconsideration granted on other grounds, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (pre-*Tangreti* decision holding that "[i]n order to hold supervisors liable for creating a custom or policy fostering a constitutional violation, courts in this Circuit have required that plaintiffs plead more than conclusory allegations of the existence of the custom or policy.") (collecting cases).

---

generally stated that the five-factor test is no longer good law." *Id.* at *8 (collecting cases).

Here, Brunache expressly alleges that Annucci implemented a policy that specifically was used to deny him Gabapentin or any alternative pain medication to treat his long-standing pain and neurological condition.  Other cases involving conclusory allegations of an unwritten policy of Annucci or some other high ranking corrections official are distinguishable.  *See, e.g., Santos,* 2020 WL 3211136, at *8-9 (allegation of unwritten policy of Annucci that inmates shall not be provided opioid, narcotic or pain medication with abuse potential insufficient to state claim against Annucci because plaintiff failed to allege Annucci's personal involvement and because the allegations themselves were conclusory); *Williams,* 2019 WL 350215, at *5 (dismissing a deliberate indifference claim based upon a conclusory assertion that defendants were "hampered" in their ability to prescribe morphine-based pain medication because of an alleged policy regarding a restriction against prescribing inmates narcotic pain medications).  Here, Brunache alleges that there was a written policy, HSPM 1.24, that officials relied on specifically and repeatedly to deny him adequate pain medication.  Dkt. 1, at 7, 21 (Grievance Response).  At this stage of the litigation, and mindful of the Second Circuit's directives that *pro se* pleadings must be liberally construed, the deliberate indifference claim may proceed to service against Annucci.[18]

---

[18] In allowing these claims to proceed and directing a response to them, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

2.     John Doe, Commissioner of Correction, N.Y.S.D.O.C.C.S. (2018)

To the extent Brunache intends to sue the unnamed Commissioner of the

New York State Commission of Correction,[19] *see* Dkt. 1, at 2, 13 (Second Claim);

*supra* at n.3, the claim against this Defendant is dismissed without leave to amend.

Liberally construed, the Complaint alleges either that this Defendant

formulated or carried out HSPM 1.24 within DOCCS facilities or denied him

medication at the relevant facilities or both.  Members of the Commission on

Correction "'are not endowed with any operational or supervisory responsibilities of

the Clinton Correctional or any other New York Facility,'" and, thus, "have no

power to control the internal policies or procedures of each institution[,]" *McDowell*

*v. Stewart,* No. 9:06–CV–1060 (GLS/DRH), 2008 WL 755291, at *4 (N.D.N.Y. Mar.

19, 2008) (quoting *Brody v. McMahon,* 684 F. Supp. 354, 356 (N.D.N.Y. 1988)); *see*

*also Davis v. Chapple,* No. 9:07–CV–0321 (GTS/DRH), 2008 WL 4663223, at *3

(N.D.N.Y. Oct. 20, 2008) (concluding that the deputy director of operations of the

Commission on Correction cannot be held liable under supervisory or policy-making

responsibilities).  Thus, John Doe, Commissioner, Commission of Correction in

2018, cannot be liable for the denial of pain medication at any of the DOCCS

facilities at which Brunache was incarcerated between 2018 and 2021 because he or

---

[19] Attached to the Complaint, is a letter from the New York State Commission of
Correction, dated November 10, 2021, which identifies Thomas Loughren as the
Commissioner.  Dkt. 1, at 31.  The Court does not know if Loughren was the
Commissioner in 2018.

she had no authority or power in relation to the operations of DOCCS or its
facilities.

     3.    <u>John Doe, New York City Department of Correction, Rikers (2017)</u>

Brunache alleges that he was first incarcerated at Rikers in 2017 and sues
the DOC Commissioner as "head" of DOC at Rikers "at the time of the start of this
whole matter and[/]or incident thereof [on] 5-1-2017." Dkt. 1, at 14 (Third Claim).
Specifically, he alleges that upon arriving at Rikers, he informed the medical staff
of his medical history and treatment related to his "nerve's damages pains or
suffering"—after checking the "New York State Heath Care System" and receiving
relevant medical records, he was seen by a neurologist and given an MRI, after
which he was given his Gabapentin. Dkt. 1, at 6. He was then transferred to
Downstate in 2018. *Id.* On March 30, 2018, while at Clinton Main, he was able to
review his medical records from Rikers and alleges that Rikers and DOC "never
informed these [DOCCS] medical staff . . . of [his] street records faxed and obtained
by then to be part of my records . . . medically always thereafter resulting in my
being immediately seen and sent [for an] M.R.I. by neurologist by then upon my
arrival at [DOC] reception medical clinic staff." *Id.* at 7.

Brunache appears to be alleging that John Doe, DOC Commissioner failed to
provide DOCCS with Brunache's medical records that Rikers had received in 2017
and this somehow led to denial of medical treatment by DOCCS. This fails to state
a plausible claim for relief against this Defendant. A defendant's "alleged act in
refusing to place [a] [p]laintiff's myelogram approval letter in his inmate medical

file, even if true, is not sufficient to state a claim of deliberate indifference because

the request is unrelated to the adequacy of the medical treatment Plaintiff received

. . . ." *Collier v. Harter*, No. 04–CV–6514–CJS, 2012 WL 1495366, at *10 (W.D.N.Y.

Apr. 27, 2012). Simply stated, there is no allegation the DOC Commissioner acted

with a sufficiently culpable state of mind when Brunache was transferred to

DOCCS's custody. *See, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir. 1998)

("To succeed in showing deliberate indifference, [plaintiff] must show that the acts

of defendants involved more than lack of due care, but rather involved obduracy and

wantonness in placing his health in danger."). Accordingly, this claim against John

Doe, DOC Commissioner, Rikers (2017), is dismissed—but with leave to amend to

allege that this Defendant was personally involved in the denial of medical care

after his transfer to DOCCS custody and acted with a sufficiently culpable state of

mind. *See Cuoco*, 222 F.3d at 112.

    4.    Superintendents of Downstate, Clinton, Coxsackie, and Orleans

    Brunache alleges that the Superintendents at Downstate (John Doe), Clinton

Main/Clinton Annex (Bell), Coxsackie (John Doe), and Orleans (Titus)

"implement[ed] and followed . . . [DOCCS Policy] HSPM 1.24 . . . against [him]

thereby causing [him] direct and indirect medical harms, pain[] and suffering."

Dkt. 1, at 14 (Fourth–Seventh Claims). The basis of these claims is that through

the filing of grievances, letters, or sick call requests at their respective facilities

based on the denial of Gabapentin without being provided an adequate, alternative

medication, these superintendent defendants were deliberately indifferent to his

pain and neurological condition.  Dkt. 1, at 6-8, 21, 23 (Downstate[20] and Clinton),

11, 27 (Coxsackie), and 11-13 (Orleans).  Grievances were filed, at least, at

Downstate and Clinton, *id.* at 6-7, 18 (Downstate Grievance), 21, 23 (Clinton

Grievances and Appeal Denials), a letter to no known addressee was filed at

Coxsackie, *id.* at 27, and a sick call slip was filed at Orleans, *id.* at 28.  He also was

seeking assistance from DOCCS's Central Office and DOCCS Chief Medical Officer

or Regional Health Services Administrator.  *Id.* at 22.

Because there are no allegations that the Superintendents knew of

Brunache's medical condition, the denial of Gabapentin, and the need for

neurological examinations and disregarded the excessive risk of harm that posed to

Brunache, this claim must be dismissed against them.  "The required state of mind,

equivalent to criminal recklessness, is that the official knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." *Hemmings v. Gorczyk,* 134 F.3d 104,

108 (2d Cir. 1998) (citations and internal quotation marks omitted).

The fact that Brunache filed grievances or letters at the facilities is not

sufficient to state a claim against the Superintendents.  *See, e.g., Hendricks v.*

*Mallozzi,* 9:20-CV-1035 (MAD/ML), 2022 WL 1129887, at *8 (N.D.N.Y. Jan. 14,

---

[20] Brunache filed a grievance at Downstate on or about March 4, 2018, and he was
transferred to Clinton Main on March 5 before the grievance was resolved. Dkt. 1,
at 6-7, 21. That grievance was addressed and denied at Clinton, *id.* at 21. Another
grievance was filed and denied at Clinton. *Id.* at 23.

2022) ("In light of *Tangreti,* [a] plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest [t]he factors necessary to establish a [constitutional] claim." (internal quotation marks omitted) (collecting cases), *report and recommendation adopted,* 2022 WL 856885 (N.D.N.Y. Mar. 23, 2022). Even before *Tangreti,* it was the majority view in the courts of the Second Circuit that "[t]he denial, or affirmance of a denial, of a grievance by a Superintendent or other supervisory official is insufficient, without more, to create personal involvement in alleged violations[.]" *Rogers v. Artus*, No. 13-CV-21, 2013 WL 5175570, at * 3 (W.D.N.Y. Sept. 11, 2013) (citations omitted).

Further, "[d]ismissal [against supervisory officials] is particularly appropriate . . . where the grievance determinations related to plaintiff's medical care." *Forshey v. Miller*, 9:17-CV-575 (LEK/ATB), 2018 WL 6271840, at * 3 (N.D.N.Y. Nov. 7, 2018), *report and recommendation adopted* 2019 WL 720074 (Feb. 20, 2019) (first citing *Battle v. Recktenwald*, No. 14 CV 2738 (VB), 2016 WL 698145, at *10 (S.D.N.Y. Feb. 19, 2016) ("defendant's denial of an administrative grievance or a refusal to override the medical advice of medical personnel are insufficient to establish liability for an Eighth Amendment violation. . . . This rule is grounded in the principle that a plaintiff must allege defendant' personal involvement in the claimed violation of his rights."); and then citing *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) (finding that a prison official deciding grievance related to medical care may "rely upon and be guided by the opinions of medical personnel

concerning the proper course of treatment administered to prisoners and cannot be held to have been 'personally involved' if he does so.'"))

Here, all that is alleged, at most, is that Brunache filed grievances or some form of complaint or sick call request at the facilities in which he was incarcerated and the grievances or request for treatment were denied. *Id.* at 21, 23. Even assuming the Superintendents were aware of the grievance or complaints, their "mere knowledge" is insufficient to adequately plead a Section 1983 violation. *Fernandez v. Superintendent, Downstate Corr. Facility*, No. 20 CV 10287, 2022 WL 443646, at *3 (S.D.N.Y. Feb. 14, 2022) (dismissing constitutional claims against the Superintendent for failure to act on prior complaints regarding medical examinations based upon denial of appeals of grievances regarding the issue) (citing *inter alia, Tangreti*, 983 F.3d at 616). The Eighth Amendment claim against each Defendant Superintendent therefore is dismissed—with leave to amend to assert that the Superintendents or some other individuals at the facilities were personally involved in the alleged violations.

### D.   The Supplemental Complaint

Brunache was granted leave to file a supplemental complaint related only to claims of mail interference or tampering and retaliation at Orleans. Dkt. 4. He filed a Supplemental Complaint against Annucci, Wyoming, and ECMC. He alleges that, following an MRI at Wyoming on January 18, 2022, he was sent to ECMC for an orthopedic consult, but the Defendants sent him to ECMC without the MRI and report from Wyoming. Dkt. 5, at 5-8. As a result, the orthopedic specialist refused

to examine him and only agreed to provide him an x-ray. This further delayed treatment for his pain and continued suffering. *Id.* Upon his return to Orleans, he was told that it was reported that he refused his appointment and was abusive at ECMC. *Id.* at 8. He was also accused of being abusive to the nurse upon his return to Orleans. *Id.* An investigation into this conduct was begun by the Area Sergeant. *Id.* He further alleges that he then became fearful for his life and "realized" this all was done in retaliation because his Complaint had been opened or tampered with outside his presence when he placed it in the mailbox for forwarding to the Court and DOCCS became aware of his lawsuit. *Id.* at 8-9.

He also alleges that Orleans mail staff opened his Complaint and delayed its filing with the Court from February 28 until March 8, 2022. Dkt. 5, at 8, 19 (DOCCS Authorized Advance Request for Postage), and 21-22 (Grievance).[21] He asserts that while the mail package containing his Complaint was in the hands of Orleans for mailing, it was opened outside of his presence and returned to him "unsealed" because the "certification sticker" was not properly placed on the envelope. *Id.* He claims that this conduct has compromised his lawsuit.

   1. <u>Interference with medical treatment</u>

The Court first addresses Brunache's claim that Annucci, ECMC, and Wyoming acted in concert to further delay his medical treatment when he was seen

---

[21] This portion of the Supplemental Complaint is not entirely clear regarding when the Complaint was finally mailed to the Court and the delay in mailing because his package lacked a "certification sticker." It was received by the Clerk of Court's Office on March 10, 2022. Dkt. 5, at 8; Dkt. 1, at 1.

at ECMC without his MRI and report in violation of the Eighth Amendment. *Id.* at 5-7. This claim exceeds the scope of the leave Brunache was granted to file a supplemental complaint, *see* Dkt. 4. It will not be considered and is dismissed.

## 2. Mail Interference

Brunache alleges that his mail package containing the Complaint in this matter was opened outside his presence and thus its mailing was delayed. He claims this compromised this lawsuit. Dkt. 5, at 6, 8-9. Brunache alleges that he first placed the Complaint in the mailbox at Orleans on February 28, 2022, that it was returned to him opened because allegedly it did not contain a certification sticker, and that it was not mailed to the Court until March 8, 2022. *Id.* at 8. These allegations fail to state a plausible claim for relief and thus this claim is dismissed but with leave to amend.

"Under the First Amendment, prisoners have a right to the free flow of incoming and outgoing mail"—however, a prisoner's right to receive and send mail "may be regulated." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (citations and internal quotation marks omitted). Such regulations are valid if they are "reasonably related to legitimate penological interests." *Id.* Therefore, the regulation of inmates' mail by state prison officials is a "matter of internal prison administration with which courts will not interfere, absent a showing of a resultant denial of access to the courts or of some other basic right retained by a prisoner." *Angulo v. Nassau County*, 89 F. Supp. 3d 541, 553 (E.D.N.Y. 2015) (internal quotation marks and citations omitted).

While interference with legal mail may constitute a violation of an inmate's First and Fourteenth Amendment rights, *see Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003), there is no right to be free of mail inspection. *Jermosen v. Coughlin*, 877 F. Supp. 864, 868 (S.D.N.Y. 1995). For example, while a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. *Davis*, 320 F.3d at 351 (citations omitted). Rather, an inmate "must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'" *Id.* (citations omitted).

The Second Circuit has held that as few as two incidents of mail tampering could be a constitutional violation "(1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139.) The Second Circuit observed that after *Washington*, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face." *Davis*, 320 F.3d at 351 (collecting cases). It is "not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." *Antrobus v. City of New York*, No. 11 CIV. 2524 RA, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (collecting cases). "However, where incidents of tampering are few, specific allegations of invidious intent or of actual harm are generally required." *Smith v. City of New York*, No. 14CV443-LTS-

KNF, 2015 WL 1433321, at *5 (S.D.N.Y. Mar. 30, 2015) (citing *Davis,* 320 F.3d at

351).

Here, Plaintiff's allegations fail to establish that any such interference with

his mail has resulted in a denial to access to the court or any other injury.  He

alleges only one instance of mail tampering, and any allegations that his Complaint

was compromised are wholly conclusory and do not support a constitutional

violation.  Additionally, there are no allegations that Annucci was personally

involved in the opening of the Complaint, and there can be no plausible claim that

Wyoming and ECMC were involved in this claim.  This claim is therefore dismissed.

3.    Retaliation

Brunache asserts that because his Complaint was opened sometime between

February 28 and March 4, 2022, DOCCS became aware of his allegations and that,

as a result, Annucci acted in concert with Wyoming and ECMC and prevented the

forwarding of his MRI and report from Wyoming to ECMC for his March 10

appointment at ECMC.  Dkt. 5, at 5-9.  This led to a further delay in his treatment

and was done in retaliation for this lawsuit.  *Id.*  This claim is wholly conclusory

and unsupported by any plausible allegations and therefore is dismissed with leave

to amend.

Prison officials may not retaliate against prisoners for exercising their

constitutional rights. *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977).

To make out a Section 1983 retaliation claim, a prisoner must show: (1) that he was

engaged in constitutionally protected conduct; and (2) that the prison official's

conduct was taken in retaliation for the prisoner's protected conduct. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). As the Second Circuit has noted, "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (citations and internal quotation marks omitted). Moreover, courts recognize that retaliation claims by prisoners are especially "prone to abuse" since prisoners can claim retaliation for every decision they dislike. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). "[B]ecause we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Thus, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone [because i]n such a case, the prisoner has no factual basis for the claim . . . ." *Flaherty*, 713 F.3d at 13.

Brunache's retaliation claim is precisely the type of unsupported and conclusory claim the Second Circuit cautioned against—and held could be dismissed on the pleadings alone. *Id.* He alleges that someone at Orleans opened his Complaint, and this caused Annucci, ECMC, and Wyoming to somehow agree to prevent his MRI and results from being forwarded to ECMC to deny him medical

care. This claim fails in all accounts to state a plausible claim for relief. *See, e.g.,*
*Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (stating that the complaint must
allege facts sufficient "'to raise a right to relief above the speculative level on the
assumption that all the allegations in the complaint are true.") (quoting *Twombly*,
548 U.S. at 555 (citation omitted)). A plaintiff cannot rest an alleged civil rights
violation on vague and conclusory allegations. *Covington v. City of New York*, No.
94 Civ. 4234(SAS), 1998 WL 226183, at *3-4 (S.D.N.Y. May 4, 1988). This claim is
dismissed but with leave to amend. *See Cuoco*, 222 F.3d at 112.

## E.    Amended Complaint

As set forth above, Brunache will be provided an opportunity to file an
amended complaint in which he can re-allege the claims set forth in Complaint and
Supplemental Complaint in a single pleading to state claims that are plausible on
their face. *See Iqbal*, 556 U.S. at 678. The Amended Complaint, for each separate
claim or act of misconduct alleged, shall specify (i) the alleged act of misconduct; (ii)
the date or dates on which such misconduct took place; (iii) the name or names of
each individual (Defendant) who participated in such misconduct; (iv) where
appropriate, the location where the alleged misconduct occurred; and (v) the nexus
(connection) between such misconduct and Brunache's constitutional rights.
Brunache may attach exhibits to his Amended Complaint, but they must be
relevant to the allegations of the Amended Complaint and organized in such a way
that the Court and Defendants can read and determine their relevance; the Court
will not independently examine exhibits that Plaintiff does not specifically reference

(by the exhibit's page number) in his Amended Complaint. Again, Brunache must name the individuals whom he seeks to include as Defendants in this action in both the caption and the body of the Amended Complaint and the Amended Complaint must assert claims against each, and every Defendant named in the Amended Complaint. If Brunache does not know the name of a defendant, he can name that individual as a John or Jane Doe Defendant—but, if he does so, he must provide sufficient information to enable the John or Jane Doe to be identified.

### F.    Motion for TRO

Brunache seeks a TRO directing Annucci to arrange for him to be examined by a neurologist to obtain a prescription for a proper course of physical therapy "designed to restore[] and maintain the full function of his leg and back . . . ." Dkt. 6, at 1-2. He declares that he has a serious back and nerve "problem" that pre-dates his incarceration and for which he has made "every attempt" to obtain proper treatment while incarcerated. *Id.* at 3. He restates what occurred at his March 10, 2022, appointment at ECMC, and that on March 30, he received a memorandum stating that his orthopedic examination would be rescheduled but the appointment has not been rescheduled to date. *Id.* at 4-5.

To obtain a temporary restraining order,[22] a plaintiff must establish: "(1) irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b)

---

[22] "In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for issuance of a preliminary injunction." *Sherman v. Corcella,* No. 3:19-CV-1889 (CSH), 2020 WL 4035064, at *2 (D. Conn. July 16, 2020) (citations omitted).

sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *See Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (quoting *Plaza Health Labys, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)).  He also must support any request for a temporary restraining order with proof or evidence beyond his own unsworn allegations.  *See Ashcroft v. N.Y. State Dept of Corr. & Cmty. Supervision*, No. 1:18-CV-00603 EAW, 2020 WL 210754, at *1-2 (W.D.N.Y. Jan. 13, 2020).  Brunache's motion does not meet those requirements.

Brunache's allegations are too conclusory to establish his entitlement to the extraordinary relief he seeks.  His request for a TRO is unsupported by any documented proof and does not meet the standards necessary for granting a TRO.  His declaration and exhibits are little more than a restatement of the facts alleged in his Complaint and, without more, are not sufficient to grant a TRO.  The motion therefore is denied without prejudice.

### G.     Motion to File a Supplemental Complaint

After filing the Supplemental Complaint and Motion for a TRO, Brunache filed another Motion to File a Supplemental Complaint, which, as best the Court can discern, seeks to add additional claims of mail interference and retaliation.  Dkt. 8.  This motion, however, does not attach a proposed supplemental complaint as required by Loc. R. Civ. P. 15(a).  This Rule provides, in pertinent that: "A movant seeking to amend or supplement a pleading must attach an unsigned copy

---

of the proposed amended pleading as an exhibit to the motion." Loc. R. Civ. P. 15(a). Because the motion does not include as an exhibit a proposed supplemental complaint, it is denied without prejudice. If Plaintifff wishes to include in this action the additional supplemental claims requested in his motion, he must include them in the amended complaint he is directed to file herein. *See supra* at 42-43.

## CONCLUSION

For the reasons set forth above, several of Brunache's claims in both the Complaint and Supplemental Complaint must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) unless he files one amended complaint **no later than 45 days after the date of this Decision and Order** in which he includes the necessary allegations regarding his Eighth Amendment deliberate indifference claims and his First Amendment mail interference and retaliation claims, as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

Brunache is advised that an amended complaint is intended to completely replace his prior Complaint and Supplemental Complaint in this action, and thus it "renders [any prior complaint] of no legal effect." *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977), *cert. denied sub nom., Vesco & Co., Inc. v. Int'l Controls Corp.*, 434 U.S. 1014 (1978); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, Brunache's amended complaint must include all of the allegations against each of the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in this action which Defendants must answer.

If Brunache fails to file an amended complaint as directed, all of his claims set forth in the Complaint and Supplemental Complaint, except the Eighth Amendment deliberate indifference claim against Annucci <u>only</u>, will be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and service of the remaining claim on Annucci shall be directed.

## ORDER

IT HEREBY IS ORDERED, that the claims against Defendants in their official capacity and the claim against the Commissioner of the New York State Commission of Correction are dismissed with prejudice;

FURTHER, that Brunache is granted leave to file an amended complaint <u>only</u> as directed above[23] **no later than 45 days after the date of this Decision and Order**;

FURTHER, that the Clerk of the Court is directed to send to Brunache with this Decision and Order a copy of the original complaint, a blank Section 1983 complaint form, and the instructions for preparing an amended complaint;

FURTHER, that in the event Brunache fails to file an amended complaint as directed above **no later than 45 days after the date of this Decision and Order**, the Complaint's Eighth Amendment deliberate indifference claim and the Supplemental Complaint's First Amendment mail interference and retaliation

---

[23] Brunache is reminded that he must also <u>include</u> in this amended complaint his Eighth Amendment deliberate indifference claim against Annucci; because the amended complaint will become the sole complaint in the action, it is the only complaint which will be served on the parties.  Failure to include these claims in it means that they are not preserved for service on the defendants.

claims are dismissed pursuant to 28 U.S.C. §§ 1915(2)(2)(B) and 1915A with

prejudice without further order of the Court and the Clerk of Court shall terminate

all Defendants except Anthony Annucci as parties to this action;

FURTHER, that in the event Brunache has failed to file an amended

complaint **no later than 45 days after the date of this Decision and Order** ,

the Clerk of Court is directed to cause the United States Marshal to serve copies of

the Summons, Complaint, and this Decision and Order upon Defendant Anthony

Annucci, without Brunache's payment therefor, unpaid fees to be recoverable if this

action terminates by monetary award in Brunache's favor;[24]

FURTHER, that Brunache's motion for a Temporary Restraining Order, Dkt.

6, and Motion to File a Supplemental Complaint, Dkt. at 8, are denied without

prejudice;

FURTHER, the Clerk of Court is directed to forward a copy of this Order by

email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional

Office <Michael.Russo@ag.ny.gov>;

FURTHER, that, pursuant to 42 U.S.C. § 1997e(g), Annucci is directed to

answer the Complaint; and

---

[24] Pursuant to a Standing Order of Court, filed September 28, 2012, a defendant
will have 60 days to file and serve an answer or other responsive pleading, see Fed.
R. Civ. P. 12(a)-(b), if the defendant and/or the defendant's agent has returned an
Acknowledgment of Receipt of Service by Mail Form within 30 days of receipt of the
summons and complaint by mail pursuant to N.Y. C.P.L.R. § 312-a.

FURTHER that Brunache shall notify the Court in writing if his address changes.  The Court may dismiss the action if Brunache fails to do so.

SO ORDERED.

DATED:    January 9, 2023
          Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE